## BAPTIST SOCIETY IN WILTON *vs.* TOWN OF WILTON.

Where in the grant of a township, there was a lot of land reserved "for the ministry," and afterwards the inhabitants of the town sold the lot so reserved, and put the proceeds of the sale at interest, as a fund for the support of a minister : It was held that the fund was the property of the town, and that a part of the inhabitants incorporated as a religious society could not recover of the town any part of the said interest to be applied to the support of a minister of said society.

Assumpsit for $300 money had and received. The cause was tried here at April term, 1821, upon the general issue, when it appeared in evidence, that on the 16th June, 1749, the Masonian proprietors granted to *Thomas Read* and forty-five other persons, a tract of land five miles square, which was then already laid out into lots, and the lots of each grantee respectively ascertained. In this grant there was a reservation, as follows : " one share for the first settled min-" ister, and one for the ministry, and one for the school there " forever, which said three shares and lots shall be the same " as drawn and already entered on the schedule and plan " annexed to said grant."

The share reserved for the ministry as aforesaid, contained three lots, viz. lot No. 17 in the second range, lot No. 9 in the first range, and lot No. 8, in the eighth range. The said grantees immediately took possession of the share reserved for the ministry, and applied the profits of it to the hiring of teachers of the christian religion. In 1763, the inhabitants and grantees of the said tract of land, granted the use and income of the three lots aforesaid, to the Rev. *Jonathan Livermore*, as part compensation for public instruction in religion, and he settled there and became their minister.

On the 2d January, 1765, the said inhabitants were incorporated as a town by the name of Wilton, and the town, after Mr. *Livermore* ceased to be their minister, continued to apply the lots to the use of the ministry, until the year 1803, when the said three lots were sold by the town, and the proceeds, amounting to $2,500, set apart as a fund, and the interest has been annually received by the town, and expended in procuring public religious instruction.

Until the year 1818, there was only one religious society in Wilton, and that was a congregational society. On the 25th June, 1818, a part of the inhabitants of Wilton were incorporated as a religious society, by the name of the Baptist Society in Wilton. The members of this society were duly organized as a corporation, and having settled a minister of the denomination of christians, called Baptists, before the commencement of this action, demanded of the town of Wilton their share of the interest of the said fund, to be applied to the support of their said teacher. At the time the plaintiffs were incorporated, the members of the corporation paid about one eighth part of the taxes raised in the town of Wilton.

Upon these facts the court directed a nonsuit to be entered, subject to the opinion of the court upon the above case.

RICHARDSON, C. J. It seems always to have been understood in this state, that lands originally reserved in the respective towns for the use of the ministry, were the property of the towns; and lands of this description have always been occupied, and sold, and transferred by the respective towns claiming them as the absolute property of the towns.

In Massachusetts, provision has been made by law to preserve and render more effectual grants and donations to charitable and pious uses. *Col. & Prov. Laws* 605, *& Mass. Statute of Feb.* 20, 1786.—2 *Mass. Rep.* 500.—7 *do.* 445.—10 *do.* 93.—12 *do.* 285.—14 *do.* 333.—15 *do.* 464. There the ministers of the several protestant churches are sole corporations, capable of taking in succession any parsonage land, and no alienation made by any minister of any such land is valid, any longer than he continues minister, unless such alienation be made with the consent of his town; and an alienation of the parsonage by the town is void. But in this state no such provision has been made by law. A settled minister has no interest in the parsonage lots belonging to the town where he is settled, unless by contract with the town.

A general opinion seems to have prevailed in this state, that the lots reserved by the proprietors of townships for the ministry and for schools, were intended to aid the first inhabitants in educating their children, and in procuring religious instruction, and thus to induce individuals to become inhabitants of the town. That those lots were intended as an absolute gift to the inhabitants of the towns, to be applied to those purposes at their discretion; and that, in fact, they were not intended to be vested in the towns in trust, to apply the rents and profits to those objects; but were, in truth, given as a temporary aid to the first inhabitants. It is certain that towns have always claimed and exercised the right of selling and conveying the lots reserved for the ministry and for schools, at their pleasure, and we are not aware that this right has ever been called in question. Belknap, in his history of this state, vol. 3, p. 244, says, " it has been a " common practice in all the grants of townships which have " been made, either by the crown or the Masonian proprie- " tors, to reserve one share, equal to that of any other " grantee, for the first settled minister, as his own right, be- " sides a parsonage lot. This has proved a great encourage- " ment to the settlement of ministers in the new towns."

The manner in which these reservations were made, gave some countenance to the general opinion that prevailed on the subject. The reservation in this case was " one share " for the first settled minister, and one for the ministry, and " one for the school there forever." No doubt was ever entertained that the first settled minister became the absolute owner of his share in fee simple, free from all trusts, and it was not very unnatural that towns should suppose that they were the owners of the other two shares in the same manner.

It is also worthy of remark, that until the statute of 1819, cap. 76, was passed, we had no public act creating parishes, and defining their powers. All parishes, before that time were created by private acts. The power given to towns to raise money for the support of the ministry, was given among other powers merely municipal, in the act for regulating towns. No provision was made by law to preserve any trust supposed to exist in these reservations, and indeed until the passage of the statute of 1821, cap. 6, we had no court possessing proper powers to remedy breaches of trusts in such cases.

Whether these reservations might not have been considered originally as trusts, which towns were bound to apply specifically to their intended objects, it is unnecessary now to inquire. It is enough that the inhabitants of our towns have generally viewed them in a different light, and have acted accordingly, and that they cannot now be viewed as trusts, without great public inconvenience. If we should now decide these reservations to be trusts, and hold towns to a specific performance of the trust, it would lead to endless litigation and expense, without any essential service to the cause of religion or education. It would be much better in every point of view, to compel by a general law, every town in the state to raise a fund for the use of the ministry and for schools, than to attempt, through the medium of courts of justice, to collect the " *disjecta membra*" of these reservations, and convert them into funds for those purposes.

The first inhabitants of this country considered the settlement of ministers and the establishment of schools as matters of the highest importance. In general, those who first settled in the new townships were poor, and we have no doubt that these reservations were intended to aid those who went into the new towns. They were like the advancements which a parent makes to his children, to enable them to set out in the world. It was not intended that the towns should hold the reservations in trust, to apply them specifically to those purposes, but they were absolute gifts, intended merely to augment the ability of the inhabitants to procure instruction for themselves and their children.

If this be a correct view of these reservations, the present action cannot be maintained. The land sold belonged to the town of Wilton, and the money arising from the sale is the property of the town, and not the property of individuals. It is perfectly clear that individuals belonging to a town cannot by any action whatever recover a share of the funds of the town, to be applied to their own separate use. And we are of opinion that if this were a trust fund, the law would be the same. The reservation was general, " for " the ministry," leaving the management of the trust to the discretion of the town. If the town then apply the fund to the hiring of a minister, whom a majority approve, can we say that the fund is misapplied? When a minister is settled in a town, all may have the benefit of his teaching if they choose, and if they cannot conscientiously hear him, it is their misfortune. Individuals may think that if they had their share of the fund, they would lay it out more to their own profit; but the donation was not to individuals, but to a corporation, and to be laid out agreeably to the will of the corporation. It is the misfortune of these plaintiffs that they are a minority in the town of Wilton; but should the time ever arrive when the members of this society shall constitute a majority of the town of Wilton, this fund will be unquestionably at their disposal, and they may apply it in such manner as they may think best. *Judgment for the defendants.*