# MERRIMACK,

## DECEMBER TERM, A. D. 1853.

## Rice *v.* Wadsworth.

A town sold the lands set apart by the original proprietors of the township for the support of the gospel, and also the school lands, and lent the money received therefor, and appropriated the interest thereon for the support of the gospel and of schools. The town subsequently purchased a poor farm with the money, with a proviso that the money "should be refunded back to said town" whenever the town should so vote. In the year 1839, there was an article in the warrant "to see if the town will vote to refund back to said town the ministerial and school funds, so that the town may receive the benefit of the interest for the purpose for which it was originally intended," and it was voted that the interest be collected and paid over to the different religious denominations, as it formerly had been. In the year 1846, the amount so collected and paid over was $86,53, and this sum was included in the sum of $2,300, which the town voted to raise, to defray the necessary charges and expenses of the town. In an action against the collector, for distraining the plaintiff's cattle for the non-payment of his tax for that year, it was *held* that as the ministerial and school funds were the property of the town, and had been expended in the purchase of a farm, the town could not raise money under the name of interest on the fund, for the purpose of distribution.

The literary fund was expended by the town in the purchase of a poor farm, and the town then voted to appropriate the interest arising from it for schooling ; to appropriate $150, yearly, of the arrearages of the interest; and to pay interest on the arrearages, and interest on the arrearages of the interest. Whether a tax could be legally assessed for such purposes, *quœre ?*

A tax cannot be legally assessed to raise a sum equal to the interest of the surplus revenue, after it is expended, for the purpose of being divided among the tax paying polls.

Trespass, brought to recover damages for taking one red cow, of the value of $25, and one yearling steer, of the

value of $12, in all of the value of $37, property of the plaintiff, alleged to have been wrongfully taken and converted to his own use, by the defendant, at Henniker, on the 12th day of February, 1849.

The animals were taken on the 12th day of February, 1849, by distress, for non-payment of the plaintiff's taxes for the year 1846, by Zadock Dustin, jr., collector of taxes in Henniker for the year 1846, by virtue of a warrant, signed by the defendant and one Parrott Marsh, before that time deceased, as selectmen of Henniker for the year 1846. The tax of the plaintiff, included in the list to which the warrant was annexed and for which the distress was made, amounted to $30,82.

The tax was assessed and the warrant issued under the following circumstances, and contained the directions hereinafter stated.

The town of Henniker had many years previous to the year 1846, sold the lands set apart, by the original proprietors of the township, for the support of the gospel and the school lands, so called, and lent the money received on the sales, and appropriated the interest arising on the funds so lent, annually, for the support of the gospel and schools. The town had also received its proportion of the literary fund from the State, under the act of December 31, 1828, and lent that upon interest, and appropriated the interest accruing thereon for the purposes of schooling.

Subsequently, in the year 1837, the town appropriated all these funds for the purpose of purchasing, furnishing and stocking a poor-farm, with a proviso that the funds "should be refunded back to said town," whenever the town should so vote, and all the funds were that year collected and used accordingly.

In 1839, the warrant for the annual meeting contained this article: "6th. To see if the town will vote to refund back to said town the ministerial and school funds, so that the inhabitants of said town may receive the benefit

of the interest arising from the said funds for the purpose which it was originally intended, or act anything relative thereto."

Under which article the town voted as follows : " Voted that what is now due to the town, of interest arising from the ministerial funds, be collected and paid over to the different religious denominations, as it formerly had been, previous to 1837." The interest was so divided, amounting to about $86 per year, for that and the succeeding years up to 1842, when the town voted, under an article in the warrant for that purpose, as follows :

14th. Voted that the ministerial interest money be appropriated the same as last year, and for the future, until otherwise ordered by said town." In pursuance of which vote, the interest on the sum was annually divided and paid over to the several religious societies in Henniker, up to and including the year 1846. The amount so divided and paid over in 1846 was $86,53.

After the appropriation of the literary and school funds, in 1837, the town did not appropriate the interest on the same until 1845, when the following article was inserted in the town warrant.

" 14th. To see what action the town will take in regard to the interest arising from the school fund or funds, or act anything relative thereto."

Upon which article the town voted as follows :

" 14th. Voted to appropriate the interest arising from the school and literary fund for schooling, yearly, hereafter."

" Voted to appropriate one hundred and fifty dollars, yearly, of the arrearages of the interest arising from the school and literary fund."

" Voted to pay interest on the arrearages from the present time until it is paid."

" Voted to pay the interest on the arrearages of interest arising from the school and literary fund, from the time it should have been paid up to this time."

Some years previous to the year 1846, the town of Henniker received from the State, as its proportion of the surplus revenue deposited with the State of New Hampshire, the sum of $4,846,26, and placed it in the hands of an agent to be taken care of. Of this fund the town, at various times, had taken, under the pretence of borrowing the same, certain portions for the use of the town, for which the selectmen for the time being gave their notes, as selectmen, to the agent, until, at the time of the annual meeting in 1846, all but about $500 of the sum of $4,846,26, had been taken from the agent, by the town.

The town had always treated the sums so taken as borrowed money, and the interest arising on the same had been annually paid by the town, and disposed of in the same way as the interest collected on that portion of the fund, still lent to individuals, in accordance with the votes of the town.

In the warrant for the annual meeting in March, 1846, the following articles were inserted:

" 8th.    To see how much money the town will raise to be appropriated for schooling the year ensuing."

" 10th.    To see if the town will vote to make any distribution of the interest arising from the surplus revenue."

" 11th.    To see how much money the town will raise to defray town charges the year ensuing."

Upon which articles the town voted as follows:

" 8th.    Voted to raise the sum required by law to be appropriated for schooling, with the addition of one hundred and fifty dollars of the arrearages of the interest arising from the school and literary fund."

" 10th.    Voted that the interest on the surplus revenue, deposited with this town, whether in the hands of the town or loaned to individuals, be annually divided among the tax paying polls, in part payment of their several poll taxes, until the town shall otherwise order."

" 11th.    Voted to raise twenty-three hundred dollars, to

defray the necessary charges and expenses of the town for the ensuing year."

The selectmen, in pursuance of the vote upon the 10th article in the warrant, proceeded to divide the interest on the whole of the fund among the tax paying polls, by inserting in the list of taxes of that year, committed to the collector for collection, the sum of eighty-nine cents at the left hand of each poll tax payer's taxes ; and in the warrant for the collection of the taxes that year, ordered the collector to pay " to each of the tax paying polls named in said list the sum set against their names to the left hand of their taxes in said list." The same course had been pursued in preceding years, and the collector of taxes proceeded and was continuing to pay the eighty-nine cents to each tax paying poll, until the month of November, 1846, when he was stopped by an injunction from the superior court " from distributing or paying to the tax paying polls of said town of Henniker, any more or any greater sum, in the whole, than the interest of the balance of said surplus revenue, remaining unexpended, and which was lent to individuals on the first day of April, 1846."

The whole amount of the State, county, town and school tax, assessed by the selectmen that year, was $4,436,92.

The amount of the State tax was $418,80.

The amount of the county tax was $660,77.

The amount required by law to be raised for the support of schools was $698,00.

If, upon the foregoing statement of facts, the court should be of opinion that this action could be maintained, it was agreed that judgment should be rendered for the plaintiff, for the sum of $31,20, and interest from the 12th of February, 1849, with costs; otherwise judgment to be rendered for the defendant for his costs.

*Fowler* and *Bellows*, for the plaintiff.

If the assessment is illegal, an action of trespass lies

against the selectmen.   *Henry* v.  *Sargent*, 13  N.  H.  Rep.
321.

It was illegal, because they assessed more than they had
a right to assess, upon any view.

The amount assessed was........................$4,436,92
State tax,...........................$418,80
County tax............................660,77
School tax,............................698,00
Town charges,.........................2,300,00
Five per cent. on above,................203,87
                            ——— 4,281,44

        Excess,.............................155,48

This excess makes the whole assessment illegal and void.
*Libby* v. *Burnham*, 15 Mass. Rep. 144 ; *Huse* v. *Merriam*, 2
Greenl. 375, where the excess was eighty-seven cents;
*Wells* v. *Burbank*, recently decided in the county of Coös,
where the excess was nine cents.

The assessment was also illegal, because there was in-
cluded in it the sum of $2,300, voted, in form, for town
charges, but in reality to include an amount for interest on
a fund mostly expended.

The form cannot affect its validity.   In *Brown* v. *Marsh*,
1 Foster's Rep. 81, the court held, in substance, that the town
could not raise money for this purpose, although raised in
form for town charges.

The fund, the interest of which they sought to raise, had
been lawfully expended and was gone, except a small part.
Rev. Stat. p. 54, § 3.

The whole question, in this case, was settled by the de-
cision in *Brown* v. *Marsh*, 1  Foster's Rep. 81, where the
decree was that an injunction should issue to restrain the pay-
ing out to the tax paying polls anything beyond their share of
the interest on the unexpended balance, and this went upon
the ground that the town had no power to raise money to

pay the interest on this unexpended fund. The facts were before the court in that case as now.

The ministerial and school funds stand upon the same ground. These funds had been lawfully expended, and the money was the property of the town, and not held in trust. *Baptist Society* v. *Wilton*, 2 N. H. Rep. 508.

The assessment included $150 for interest on the school fund, and $86,53 for interest on the ministerial fund, and was, therefore, illegal and void.

*Pierce & Minot*, for the defendant.

I. If the plaintiff was taxed more than he was legally liable, yet this action cannot be sustained.

1st. The plaintiff must resort to the remedy provided by statute. *Walker* v. *Cochran*, 8 N. H. Rep. 166.

A remedy is provided applicable to this case. Rev. Stat. ch. 44.

2d. A part of the tax, if not all, was legal, and that will justify the seizure, so that trespass cannot be maintained. *Parker*, C. J., in *Perry* v. *Buss*, 15 N. H. Rep. 224.

II. The selectmen did not assess more than they had a right to.

*1st.* State tax was..........................$418,80
County tax,.............................660,79
School tax,.............................698,00
School tax, additional,...................150,00
Town charges,.........................2,300,00
                                        ----------
                                        4,227,59
Five per cent............................211,37
                                        ----------
Amount they had a right to assess,.......4,438,96
Amount assessed,......................4,436,92
                                        ----------
                                          2,04

The assessment of $150, additional for schools, was legal.

The $698 was the amount required by law to be raised.

By chapter 72, section 2 of the Revised Statutes, the town was authorized to raise any sum additional, not exceeding the amount required by law. It was accordingly voted to raise $150.

The true construction of the eighth vote, taken in connection with the eighth article in the warrant, is to raise the sum required by law and $150 additional. The further addition in the vote, as to the source from which the $150 was to be taken, cannot affect the substance of the vote.

2d. The assessment of the $2,300 was legal.

Article 11th, and the vote upon it, were in reference to town charges and expenses, which were proper matters for the assessment of a tax.

The article and vote, as they appear on the record, are legal; and extrinsic evidence is inadmissible to explain or control them.

The legal inferences from the article and vote are that the charges and expenses intended are those which are proper matters for taxation; and the legal presumptions are in favor of the legality of the vote. These inferences and presumptions cannot be rebutted by extrinsic evidence.

GILCHRIST, C. J. The question, in this case, is whether the assessment of taxes was or was not legal, and in order to determine that question, it is necessary to inquire into the relation of towns to ministerial and school funds of this description.

In the case of the *Baptist Society* v. *Wilton*, 2 N. H. Rep. 508, the manner in which these funds are held by towns is considered by the court. *Richardson*, C. J., examines the question with considerable care, the point being whether the funds were the property of the towns. His language is as follows: " A general opinion seems to have prevailed in this State that the lots, reserved by the proprietors of townships

for the ministry and for schools, were intended to aid the first inhabitants in educating their children and in procuring religious instruction, and thus to induce individuals to become inhabitants of the town; that those lots were intended as an absolute gift to the inhabitants of the towns, to be applied to those purposes at their discretion, and that, in fact, they were not intended to be vested in the towns in trust, to apply the rents and profits to those objects, but were in truth given as a temporary aid to the first inhabitants. It is certain that towns have always claimed and exercised the right of selling and conveying the lots reserved for the ministry and for schools, at their pleasure, and we are not aware that this right has ever been called in question. * * * * The manner in which these reservations were made, gave some countenance to the general opinion that prevailed on the subject. The reservation, in this case, was 'one share for the first settled minister, and one for the ministry, and one for the school there forever.' No doubt was ever entertained that the first settled minister became the absolute owner of his share in fee simple, free from all trusts, and it was not very unnatural that towns should suppose that they were the owners of the other two shares in like manner.

" Whether these reservations might not have been considered originally as trusts, which towns were bound to apply specifically to their intended objects, it is unnecessary now to inquire. It is enough that the inhabitants of our towns have generally viewed them in a different light, and have acted accordingly, and that they cannot now be viewed as trusts without great public inconvenience. If we should now decide these reservations to be trusts, and hold towns to a specific performance of the trust, it would lead to endless litigation and expense, without any essential service to the cause of religion or education. It would be much better, in every point of view, to compel, by a general law, every town in the State to raise a fund for the use of the

ministry and for schools, than to attempt, through the medium of courts of justice, to collect the *disjecta membra* of these reservations, and convert them into funds for those purposes.    *    *    *    *    It was not intended that the towns should hold the reservations in trust, to apply them specifically to those purposes; but they were absolute gifts, intended merely to augment the ability of the inhabitants to procure instruction for themselves and their children."

Consistently with the foregoing views, it was held that the Baptist Society could not recover of the town any portion of the fund, or of the interest of it, the lands having been sold, and the proceeds kept as a fund, the interest of which had been appropriated for religious instruction.    In *Candia* v. *French*, 8 N. H. Rep. 133, the above case is cited, and the powers of towns are recognized to divide among the religious societies any funds in the possession of the town, which had been before that time lawfully devoted to the support of the gospel.

The ministerial lands, then, were lawfully sold by the town.    The proceeds of the sale constituted a fund, the interest of which was devoted to the support of the gospel and of schools.    The town had, of course, the same power over the fund that they had over the land which produced the fund, and having this power, they appropriated the fund to the purchase of a poor-farm.

Now it is a matter entirely immaterial, that when the town made this appropriation, it was coupled with a proviso that the money "should be refunded back to said town," whenever the town should so vote, that is, the town made a contract with the town, that the town would refund to the town the money appropriated, whenever the town should so vote.    This is a practical absurdity, for the town could not bring an action against itself, or maintain a bill in equity to compel itself to a specific performance of the contract.    The fund is gone irretrievably, for it has been expended, and has lost all distinctive character as a fund.    No

interest can be due the town, according to the vote of 1839, for there is no principal to yield interest.

The vote in 1836 was "that what is now due to the town, of interest arising from the ministerial funds, be collected and paid over to the different religious denominations, as it formerly had been previous to 1837." This sum, which the town chose to call interest, was so divided, amounting to about $86 per year, up to 1842, when the town voted that "the ministerial interest money be appropriated the same as last year, and for the future, until otherwise ordered by said town," and the case finds that the amount so divided and paid over in 1836, was the sum of $86,53. This action was brought to recover damages for taking the plaintiff's property for the taxes for the year 1846. Of course, the plaintiff's tax included a portion of this sum of $86,53, and that is enough to make the tax illegal.

As to the literary fund, this was also appropriated in the year 1837, with the ministerial fund, to the purchase of a poor-farm.

The act of December, 1828, N. H. Laws 327, (ed. of 1830,) appropriating the literary fund, made the towns liable to a penalty for misappropriating any part of it. By the Revised Statutes 486, this act is repealed. Different provisions are made on the subject of a literary fund by the Revised Statutes 154, ch. 75, and the towns are made liable to a penalty for misappropriating the fund, to be recovered by indictment, for the use of the county. But the statute of limitations has barred all remedy for the penalty at law. The Revised Statutes 430, § 9, provide that all suits for the penalties, &c., shall be brought within two years from the commission of the offence, and this offence was committed before the year 1846. A suit cannot now be maintained for the penalty, and there is no precedent for a bill in equity being maintained in the name of the county or of the State. Neither has any pecuniary interest in the mat-

ter, and after the fund has been entrusted to the town, and the remedy has been barred by the statute of limitations, there would seem to be no power competent to call the town to account, unless some proceeding, the nature of which is doubtful, could be maintained in the name of the State.

This sum having been expended, the same remarks are applicable to it as to the ministerial fund. No interest could be produced by it. But the town voted, in the year 1845, to appropriate $150, yearly, of the arrearages of the interest, for schooling—a laudable purpose, without doubt, but which, however praiseworthy, must be pursued in a legal manner.

After the town had voted to raise this sum, they voted to raise the sum of $2,300, to defray the necessary charges and expenses of the town. This sum, as we take it, was intended to include the sum of $150, otherwise the insertion of the matter relating to the literary fund has no meaning, and this is the plain inference to be drawn from the case. A portion of this sum of $150 must also have been included in the plaintiff's taxes.

The question is raised by the case, whether what was done in relation to the literary fund makes the tax illegal. It is not, however, necessary to settle the point, as it is sufficiently determined by our decision upon the question relating to the ministerial fund, that the assessment was illegal.

As to the surplus revenue, it had been expended, excepting the sum of about $500, but the town voted to divide the interest of it among the tax paying polls, as if the money had not been expended, and the town voted to raise $2,300 for this among other purposes. This matter is substantially settled by the case of *Brown* v. *Marsh*, 1 Foster's Rep. 81, where it was held that raising money to pay the interest on the surplus revenue fund, when no fund existed, was merely raising money for the purpose of distribution, which the town could not legally do.

Our decision is, that the action can be maintained, and according to the provision in the case, there must be

_                                     *Judgment for the plaintiff.*